# EXHIBIT 4



# United States Department of the Interior
## OFFICE OF THE SECRETARY
## OFFICE OF DIVERSITY, INCLUSION AND CIVIL RIGHTS
### Washington, DC 20240

<u>TRANSMITTAL VIA ELECTRONIC MAIL</u>

jscola@johnscolalaw.com

John Scola, Esq.
Law Office of John A. Scola, PLLC
30 Broad Street, Suite 1424
New York, New York 10004

Subject:     Final Agency Decision
             *David J. McCutcheon v. Debra Haaland, Secretary,*
             *U.S. Department of the Interior*
             Agency Case No. DOI- NPS-19-0730

Dear John Scola:

After careful review and analysis of your client's Equal Employment Opportunity (EEO) complaint and the Report of Investigation (ROI), the U.S. Department of the Interior (DOI or Agency), Office of Diversity, Inclusion and Civil Rights (ODICR) takes final action on your client's complaint by issuing this Final Agency Decision (FAD). ODICR finds that your client has not been subjected to harassment and/or disparate treatment based on sex, disability, age, or reprisal, as alleged.

## I.     <u>Statement of the Claims</u>

Whether David McCutcheon (Complainant) was subjected to harassment and/or disparate treatment against on the basis of sex (male), disability (physical), age (YOB: 1960) and reprisal (prior EEO activity) when the following events occurred:

1.  On November 21, 2018, Responsible Management Official 2 (RMO2) denied Complainant's annual leave requests and in January 2019, Complainant was charged Absent without Leave (AWOL);

2.  On November 28, 2018, RMO2 threatened to place Complainant on AWOL;

3.  In or around January 2019, RMO1 reassigned Complainant from his duty station at Ellis Island to work at Liberty Island;

Final Agency Decision
*David J. McCutcheon v. Debra Haaland, Secretary, U.S. Department of the Interior*
Agency Case No. DOI- NPS-19-0730

4. In January 2019, RMO2 assigned Complainant to a fixed post that required long periods of standing and where a rest room was not available;

5. In February 2019, Complainant felt threatened and intimidated when RMO2 commented "this is not over yet, there will be disciplinary action;"

6. On March 20, 2019, Complainant felt intimidated when RMO2 issued Complainant a Memorandum, Use of Ellis Island for Employee Fitness and on April 4, 2019, the RMO2 issued Complaint another Memorandum, No Contact Letter; and

7. On or about August 14, 2019, management video recorded Complainant's entrance and exits from the Park;

8. On January 10, 2020, RMO3 issued Complainant a Memorandum, Advanced Written Notice of Proposed 14-Day Suspension.

## II.    **Procedural History**

On August 27, 2019, Complainant made initial contact with the EEO Counselor. On September 19, 2019, Complainant participated in an initial interview with the EEO Counselor. The EEO Counselor sought to resolve Complainant's allegations to no avail. On October 2, 2019, the EEO Counselor issued to Complainant a Notice of Final Interview and a Notice of Right to File a Formal Complaint of Discrimination (NORTF). On October 5, 2019, Complainant acknowledged, via certified mail, receipt the NORTF. On October 17, 2019, Complainant filed this formal complaint, pursuant to Title VII of the Civil Rights Act of 1964 (Title VII), the Age Discrimination and Employment Act (ADEA), and the Rehabilitation Act. ROI, Exhibit B-3, pp. 110-112.

On October 24, 2019, the Agency acknowledged receipt of Complainant's formal complaint in a Notice of Acknowledgement. On November 22, 2019, the Agency issued a Notice of Acceptance, pursuant to the Equal Employment Opportunity Commission's (EEOC's or Commission's) Regulations found in Title 29 Code of Federal Regulations (29 C.F.R.), Part 1614. ROI, Exhibit C-2, pp. 116 -117. On January 23, 2020, the Agency received Complainant's request to add new claims to his pending complainant and accepted the amended complainant pursuant to Title 29 C.F.R. part 1614. ROI, Exhibit A, pp. 3 – 4.

On December 17, 2019, the Agency ordered a formal investigation, and the investigation was conducted from December 17, 2019, through April 30, 2020. ROI, Exhibit A, pp. 3 – 4.

On May 21, 2020, the Agency provided to Complainant, via electronic mail, the ROI, which included the investigative summary and a notice of Complainant's right to a hearing before an EEOC administrative judge (AJ) in accordance with 29 C.F.R. 1614.108(f) or, alternatively, a FAD by the Agency based on the investigative record. On August 25, 2020, Complainant received the ROI, which included the Investigative Summary and Notice of Complainant's right to a hearing via FedEx delivery. Complainant failed to make an election. Therefore, this FAD is issued by the Agency based on the investigative record in accordance with 29 C.F.R. § 1614.110.

Final Agency Decision
*David J. McCutcheon v. Debra Haaland, Secretary, U.S. Department of the Interior*
Agency Case No. DOI- NPS-19-0730

### III.    **Statement of the Facts**

#### *Background Information*

**Complainant** (male, YOB: 1960, disability; prior EEO activity), Federal Park Ranger, GS-09, Statue of Liberty/Ellis Island, NPS, New York City, New York. Complainant states he has been in this position since July 15, 1990. He states his first-line supervisor is RMO2, Supervisory Park Ranger, and his second-line supervisor is RMO1, Division Chief. He states he has been supervised by these individuals since October 2018. Complainant states he has a disability due to an issue with his left foot and Post-Traumatic Stress Disorder (PTSD) from the events in New York City on September 11, 2001. He states his disability does not affect major life activity; however, he cannot work when he has too much tension and anxiety. Complainant states he is not sure if he made a request based on his disability; however, he has made many requests for transfer to assist him in minimizing stress he incurs on the job. Complainant states management was aware of his disability because it was mentioned in his suspension rebuttal on January 27, 2010. He states RMO2 and RMO1 knew of some physical issues (foot problems) for some time; however, they kept him at his post, which aggravated these issues. He states they ignored the issue even when they received doctor's notes indicating he should not stand for long periods of time in cold weather. ROI, Exhibit F-1, pp. 138—140.

Complainant states his duties and responsibilities at Ellis Island included hosting youth programs, education programs, art displays, tours, running movie theaters, crowd-control, and outreach programs to schools. He states he had break times and worked inside, and there were times he could sit down and prepare for a program. Complainant states at Liberty Island, he basically worked crowd control; he had six positions and stood for hours on end, he did not have time for projects, programs, or outreach, and had no interaction with the crowd. He states he was exposed to the elements every day, had very few bathroom breaks, and was always standing. ROI, Exhibit F-1, pp. 141—143.

**RMO1** (male, YOB: 1976, no disability, prior EEO activity) Chief of Interpretation, Education and Visitor Services, GS-13, Statue of Liberty/Ellis Island, NPS, New York City, New York. RMO1 states he has been in this position since January 2016. RMO1 states he has been with NPS since June 1996. RMO1 states during the time relevant to the complaint, his first-line supervisor was the Deputy Superintendent, and his second line supervisor was the Superintendent. He states he is aware Complainant is male and over 40. RMO1 states has known Complainant for the duration of his career. RMO1 states he is not aware of Complainant's disability as Complainant has never mentioned a disability to him. He states to his knowledge, Complainant has never requested a reasonable accommodation (RA). He states Complainant mentioned he has filed complaints in the past; however, he is unaware of the facts those cases. He states he has prior EEO activity as an RMO. He states he is Complainant's second-line supervisor.  ROI, Exhibit F-2, pp. 261—263.

**RMO2** (female, YOB: 1956, no disability, prior EEO activity), Supervisory Park Ranger, Statue of Liberty/Ellis Island, NPS, New York City, New York. RMO2 states she has been in this position for at least two years and with NPS since May 1991. RMO2 states during the time period relevant to the complaint, her first-line supervisor was the RMO1, and her second-line Supervisor was the

Final Agency Decision
*David J. McCutcheon v. Debra Haaland, Secretary, U.S. Department of the Interior*
Agency Case No. DOI- NPS-19-0730

Deputy Superintendent. RMO2 believes Complainant is male and over 40; however, she is not aware of his disability. She states Complainant has never requested a RA from her nor is she aware if he has submitted any RA for consideration. She states she is only aware of Complainant's current EEO activity. She states she is Complainant's first-line supervisor. ROI, Exhibit F-3, pp. 275—277.

**RMO3** (male, no disability), Supervisory Park Ranger, Division of Interpretation, Statue of Liberty National Monument, NPS, New York City, New York. RMO3 states he has been in this position since May 2017 and has worked for NPS since 1984. He states during the time relevant to the complaint, his first-line supervisor was RMO1. He states he is aware of Complainant's sex through face-to-face interaction but is not aware of his age. RMO3 states he is not aware of Complainant's disability as Complainant never made any requests to him for a RA. He states he was not aware of Complainant's prior EEO activity. He states Complainant was under his operational supervision at Ellis Island from May 2017 until his reassignment to Liberty Island, but his supervisor of record was RMO2. He states to the best of his knowledge, Complainant was fulfilling the duties and responsibilities of his position while assigned to Ellis Island. ROI, Exhibit F-4, pp. 307—309.

**Witness1** (female), Park Ranger Interpretation, GS-09, Statue of Liberty National Monument and Ellis Island National Museum of Immigration, NPS, New York City, New York. Witness1 states she has been in this position since June 2018. She states she is aware Complainant is male. She states she is Complainant's coworker/peer. ROI, Exhibit F-5, pp. 339—341.

**Whether Complainant was subjected to harassment and/or disparate treatment against on the basis of sex (male), disability (physical), age (YOB: 1960) and reprisal (prior EEO activity) when the following events occurred:**

1. **On November 21, 2018, RMO2 denied Complainant's annual leave requests and in January 2019, Complainant was charged Absent without Leave (AWOL);**

**Complainant** states he applied for annual leave 90 days or more in advance, which was not denied or approved. Complainant states he moved forward and made plans with his family for that time period (Christmas holiday). Complainant states the Agency had a pattern where they either did not approve or disapprove leave or canceled everyone's leave. He states he was in a unique situation because he was in a "use or lose" leave status. He states he made the initial request to RMO2 in person, and then in writing; however, on November 21, 2018, she denied (canceled) his leave due to staffing needs. Complainant states he had already made travel arrangements. Complainant states he called the union to file a grievance; however, the Agency did not respond by the time he was originally scheduled to take leave. Complainant states his leave dates were also during a government shutdown. He states he also requested leave during that time for medical reasons (he indicated he would use annual leave instead of sick leave, since it was use or lose), because he was under doctor's care for his foot. Complainant states he provided documentation after the third day.[1] He states he had three notes from the doctor, indicating he should not stay on his foot during this

---

[1] The record contains the doctor's note provided by Complainant. In addition, the record indicates that Complainant was not charged with AWOL for the dates he attended medical appointments.

Final Agency Decision
*David J. McCutcheon v. Debra Haaland, Secretary, U.S. Department of the Interior*
Agency Case No. DOI- NPS-19-0730

time.[2] He states he was out from December 19, 2018, through December 27, 2018. He states he had to cancel his holiday travel plans because of his foot, as he had to see doctors on multiple days. He states he found out RMO2 denied his leave when he did not get paid for that time. He states he had to file a grievance, which went to Headquarters, and his leave was restored in full.[3] ROI, Exhibit F-1, pp. 141—142.

Complainant states RMO1 indicated the Agency was denying everyone's leave. He states management only indicated it was due to staffing needs. He states when he won his union grievance concerning this issue, RMO2 indicated it was not over yet; there would be repercussions. He states he took it as a personal threat. He understands many had leave denied; however, he was not aware of anyone else filing a complaint. He states he was aware Employee A filed a gender discrimination complaint against RMO2. He states there were a few junior members whose leave was approved during this time; including, Employee B (male, under 40, unknown disability, unknown EEO activity), Employee C, who was given time to go to California, and all the supervisors took time off during the holidays. ROI, Exhibit F-1, pp. 142—144.

Complainant states the way RMO2 went after him seemed personal in nature. He states management has been trying to "get rid of him" for several years, because they wanted to hire younger staff who they could control. He states one of the Rangers, Employee D, indicated RMO1 told him there would be many positions opening up, because they were going to be getting rid of older staff (they would be retiring). He believes they were just trying to move him out in any way they could. He believes his prior EEO activity was a factor because management looked at him as a troublemaker. ROI, Exhibit F-1, pp. 144—145.

**RMO1** states he was aware RMO2 denied Complainant's annual leave request at issue. He states RMO2 had the responsibility of making a bi-weekly schedule for the pay period. RMO1 states they did not have enough coverage, as 16 employees requested leave during the same timeframe (Christmas holiday); therefore, Complainant's request was denied. He states he was not directly involved in this issue, but he knew the leave would be denied. He states the seasonal workforce was leaving, and they could not approve all the requests so almost everyone's requests were denied. RMO1 states RMO2 was able to accommodate three requests, which were put in far in advance (January 2019), and were based on the order in which they were received. He states for those staff who were in a "use or lose" status, they informed them they would start the process of restoring their leave. He states afterwards, Complainant had a very heated discussion with RMO2, and indicated he was going to take the leave anyway. He states RMO2 told Complainant, if he

---

[2] Throughout the record, Complainant alleged that the Agency denied him a reasonable accommodation due to ongoing ankle injury when he was assigned "fixed-foot" posts on Liberty Island. The record shows that Complainant was originally transferred to Liberty Island due to staffing issues; however, Complainant asked to be reassigned back to Ellis Island due to Ellis Island's lack of "fixed-foot" posts positions which would be a better for his ankle injury recovery. The record shows that RMO1 and RMO2 authorized his reassignment back to Ellis Island to assist with his ankle recovery. The record further shows that Complainant remained at Ellis Island until a harassment allegation was filed against him by Witness1. As a result of this allegation, Complainant was then reassigned back to Liberty Island and given positions where he was allowed to sit, stand, and walk-around to assist with his ankle recovery. There is no evidence in the record that Complainant was denied a reasonable accommodation; instead, the record shows that the Agency sought to accommodate Complainant by first reassigning him and then by providing him posts where he could sit, stand, and walk-around. ROI, Exhibit 2, pp. 290—292.

[3] This is disputed by the testimony of several RMOs in the record.

Final Agency Decision
*David J. McCutcheon v. Debra Haaland, Secretary, U.S. Department of the Interior*
Agency Case No. DOI- NPS-19-0730

took leave anyway, he would be charged with AWOL. He states RMO2 wrote Complainant an email recording the discussion and reiterated he would be charged AWOL, if he took the leave. ROI, Exhibit F-2, pp. 266—268.

RMO1 states RMO2 consulted with him and the Northeast Employee and Labor Relations (ELR) representative; they came to the decision to charge Complainant with AWOL. He believes there were some days Complainant called out and provided medical documentation, and he was not charged for those days. He states Complainant filed a grievance, prior to going on leave, and it was dismissed because it was not filed in the appropriate timeframe. ROI, Exhibit F-2, pp. 268—270.

RMO1 states on January 30, 2019, Complainant stopped by his office and told him he was upset about the AWOL; they also discussed another matter regarding an issue with a coworker. He states he told Complainant he could not speak about the AWOL because he (Complainant) had filed a grievance and it was working through the system. He states no one else attempted to take or took unapproved leave. He states Complainant's sex, age, disability, or prior EEO activity were not factors in this action and that action this was based on Complainant taking leave that had been denied. ROI, Exhibit F-2, pp. 141—145.

**RMO2** states on November 21, 2018, she advised Complainant she had to deny his leave request, due to insufficient operational coverage, and current staffing levels. She states there were many others whose leave was also denied. RMO2 states Complainant said he had use or lose leave, and she advised him that she would fill-out the proper paperwork to ensure his leave carried over accordingly. She states Complainant then advised her he was not going to let another employee who was junior to him have their leave approved over him, and he did not care if they denied it. She states she advised Complainant if he did not report to work that he would be charged with AWOL. She states she sent Complainant a written record of their conversation, indicating he would be charged AWOL if he did not report to work. ROI, Exhibit F-3, pp. 275—277.

RMO2 states Complainant did not report to work and was charged AWOL for the days he did not provide necessary paperwork. She states she explained to Complainant that the staffing was insufficient to support operations and many of the holiday leave requests had to be denied. She states she further explained to Complainant, if he had put in his request by April 30, following the Service Computation (Comp) Date (SCD) requirements, she would have approved his leave. She states numerous leave requests came in before his, and she had to approve leave requests according to the Collective Bargaining Agreement (CBA) rules. She states she informed Complainant he would not lose his use or lose leave, and they would reinstate it to carry over accordingly. She states Complainant then yelled at her he was not going to come in, and she put him on notice that he would be charged AWOL. ROI, Exhibit F-3, pp. 277—278.

**Whether Complainant was subjected to harassment and/or disparate treatment against on the basis of sex (male), disability (physical), age (YOB: 1960) and reprisal (prior EEO activity) when the following events occurred:**

  **2.  On November 28, 2018, RMO2 threatened to place Complainant on AWOL;**

Final Agency Decision
*David J. McCutcheon v. Debra Haaland, Secretary, U.S. Department of the Interior*
Agency Case No. DOI- NPS-19-0730

**Complainant** states he was transferred from Ellis Island to Liberty Island and needed to pick-up his equipment from Ellis Island before reporting to Liberty Island. He states he was supposed to be at work by 9:30 AM and arrived about ten minutes early. He states RMO2 said she was going to charge him AWOL because he was supposed to be there prior to going to Ellis Island. He states it was a well-known policy they were not supposed to pick-up gear on their own time, so it was logical he had to pick-up his gear first. He states RMO2 indicated he should have been there a half hour earlier, and he told her he was not notified his start time had changed. He states prior to this date, his tour-of-duty began at 9:30 AM at Ellis Island; he was not told his start time would change when he went to Liberty Island. ROI, Exhibit F-1, pp. 146—148.

Complainant states Employee A was also threatened with AWOL many times, but he was not aware of the specifics. He states all the younger staff were treated better than him as they were given the best training and assignments. He states they were trying to get rid of older staff by giving them meaningless assignments and subjecting them to a hostile work environment. He states his belief that RMO2 had problems with men because "she was gay and preferred working with women." Complainant states "she seemed to side with women in most situations." ROI, Exhibit F-1, p 144. He believes it was possible his EEO activity was a factor in receiving this treatment, because upper management was aware of his past complaints. ROI, Exhibit F-1, pp. 144—152.

**RMO1** states that after Complainant was transferred to Liberty Island, he showed up at Ellis Island. RMO1 states he spoke with RMO2 and indicated Complainant was at Ellis Island making copies. RMO2 states he did not know why Complainant was there or what Complainant was doing. RMO1 states Complainant should have spoken to RMO2 first prior to arriving at his old duty location. ROI, Exhibit F-2, p. 266.

**RMO2** states on November 28, 2018, she sent Complainant a written record of their conversation that took place on November 21, 2018, reminding him, if he did not report to work on the days his leave was disapproved, he would be charged AWOL. ROI, Exhibit F-3, p. 283.

**Whether Complainant was subjected to harassment and/or disparate treatment against on the basis of sex (male), disability (physical), age (YOB: 1960) and reprisal (prior EEO activity) when the following events occurred:**

3. **In or around January 2019, RMO1 reassigned Complainant from his duty station at Ellis Island to work at Liberty Island;**

**Complainant** states he was reassigned to Ellis Island based on false accusations made by Witness1. He states the accusations were found baseless by the Regional Office. He states Witness1 told the Agency he wanted to "put her on acid." ROI, Exhibit F-1, p. 144. He states Witness1 had problems with a lot of people and bossed them around as if she were a supervisor. He states Witness1 "came on to him" and tried to come to his house. ROI, Exhibit F-1, p. 144. Complainant states Witness1 spoke about things of a "sexual nature" and said she was thinking about leaving her husband. ROI, Exhibit F-1, p. 144. He states the Park decided to conduct their own investigation, and he was issued a Letter of No Contact, which is why he was reassigned to Liberty Island. ROI, Exhibit F-1, p. 144.

Final Agency Decision
*David J. McCutcheon v. Debra Haaland, Secretary, U.S. Department of the Interior*
Agency Case No. DOI- NPS-19-0730

Complainant states RMO1 did not attempt to resolve this matter at the lowest level; instead, RMO1 took it to a higher level "to get rid of him." ROI, Exhibit F-1, p. 146. He states that, at the time of the instant complaint, he is still barred from Ellis Island. He states management has used this situation as an excuse to keep him at Liberty Island, knowing he has physical issues. Exhibit F-1, pp. 146—148.

**RMO1** states Complainant was initially moved to Liberty Island in November 2018, based on staffing needs. He states during this time, Complainant indicated he suffered an injury while running in a marathon. RMO1 states Complainant indicated he could not stand for long periods, so he moved Complainant back to Ellis Island in late December 2018.[4] He states Complainant was reassigned on January 7, 2019 (his first day back) based on his incident with Witness1. He states Witness1 did not inform them of the incident for a couple of weeks because she was waiting for an apology from Complainant; however, that did not occur. RMO1 states once Witness1 informed him of the harassment allegations, they separated Witness1 and Complainant by reassigning Complainant to Liberty Island. RMO1 states Witness1 was afraid of Complainant and felt threatened. RMO1 states Witness1 wanted to remain at Ellis Island, so they moved Complainant. He states per advice from ELR, the "victim" was not moved. ROI, Exhibit F-2, pp. 268—270.

RMO1 states during their meeting on January 30, 2019, Complainant admitted to him that Witness1's allegations (that he yelled at her and called her stupid in front of others) were true. ROI, Exhibit F-2, pp. 268—270.

**RMO2** states Complainant was reassigned to Liberty Island pursuant to a complaint by a female Ranger at Ellis Island. RMO2 states this was under guidance of 16E protocol[5], to separate the two employees. She states Complainant was working at Ellis Island when a RMO3, received a 16E complaint from a female Ranger. She states while she did not reassign Complainant to Liberty Island, she would have followed the same guidelines to separate the two. She states she did not speak to Complainant regarding this issue; she assumes he was aware of the complaint against him, and that he was reassigned to separate them. ROI, Exhibit F-3, pp. 294—295.

**RMO3** states in January 2019, Complainant was the subject of a harassment allegation by a Witness1 and was charged with being verbally disrespectful to Witness1 in front of the public. He states Witness1 sought an explanation or apology, and Complainant refused to talk to her. He states at the end of the day, Witness1 claimed she overheard a conversation where Complainant suggested they should "put her on acid," which caused her concern for well-being. He states the situation was carefully monitored. He states Complainant opted not to apologize or talk about the incident with Witness1. ROI, Exhibit F-4, pp. 311—313.

RMO3 states NPS 16E policy was clear on what could be done regarding reassignments of those involved. He states he is not aware if Complainant spoke to management about this incident. He believes the reassignment was reasonable, as it was consistent with NPS policy outlined in Director's Order 16E. ROI, Exhibit F-4, p. 314.

---

[4] *See* fn. 2.
[5] 16E complaints refers to complaints arising under Director's Order #16e: National Park Service Anti-Harassment Policy, which contains the Agency's procedures for handling complaints of harassment.

Final Agency Decision
*David J. McCutcheon v. Debra Haaland, Secretary, U.S. Department of the Interior*
Agency Case No. DOI- NPS-19-0730

**Witness1** states she was aware of the reasons behind moving Complainant to Liberty Island because she was involved (she filed a complaint of harassment against Complainant). She states she is not aware if Complainant expressed any concerns to management because she was not privy to conversations between Complainant and management. ROI, Exhibit F-5, p. 340.

**Whether Complainant was subjected to harassment and/or disparate treatment against on the basis of sex (male), disability (physical), age (YOB: 1960) and reprisal (prior EEO activity) when the following events occurred:**

4.  **In January 2019, RMO2 assigned Complainant to a fixed post that required long periods of standing and where a rest room was not available;**

**Complainant** states he was assigned to the Pedestal Post (6P), where he screened people for tickets. He states there were large crowds and constant flow and he had to ensure people did not go upstairs without a ticket. He states they were supposed to switch posts about every hour, with restroom breaks, however, in January 2019, management changed it to every four hours because they did not have enough staff. ROI, Exhibit F-1, p. 146.

Complainant states he was assigned to a fixed post, while others were able to move. He states it was the only post where he could sit because there was a chair; however, he constantly dealt with visitors, so he had to stand. He states it was extremely boring work out in the cold. He states he was in pain and not able to do education work while in the chair, which he enjoyed immensely. He states he asked management if he could do something else, and they would give him an occasional tour, but that was it. He states he told management prolonged standing, especially in the cold, was an issue for him. He states RMO1 was given his doctor's notes; however, RMO1 did not make any changes. He states he requested to speak with RMO1, but RMO1 refused to speak with him.[6] ROI, Exhibit F-1, pp. 146—148.

Complainant states the younger staff were treated better than he was as they did not have fixed work posts as often and were given better assignments. He states his belief that management was trying to make him retire and all the older rangers felt this way. He states they (older staff) did not do any program building or education work, only Security work. He states the program building and education work was mostly given to younger staff. ROI, Exhibit F-1, pp. 148—150.

**RMO1** states he was not aware of this incident. He states they rotated their staff often, and the staff were always able to use the restroom, which was stressed during morning meetings. He states staff only needed to inform their supervisor, and either the supervisor or another Ranger would relieve them. He states the restrooms were just on the mezzanine level. He states he was unaware of the changes to schedules with switching posts, or the inability to use the restroom when required. ROI, Exhibit F-2, pp. 270—272.

**RMO2** states many of the posts for Rangers were fixed posts, requiring long periods of standing. She states during the time Complainant expressed concern over his ankle, and per his preference, he was assigned to posts where he could either sit or stand, and in some cases, walk-around. She states none of the posts had a restroom immediately available, or were adjacent to a restroom;

---

[6] *See* fn. 2.

Final Agency Decision
*David J. McCutcheon v. Debra Haaland, Secretary, U.S. Department of the Interior*
Agency Case No. DOI- NPS-19-0730

however, there were no posts where a Ranger could not take a restroom break if needed. She states some posts were fixed and had to be manned; in those cases, there was a procedure to follow to request relief from a supervisor. She states she has never denied, nor would she ever deny this request from any employee. She states she was not aware of any other instance where any employee was denied a restroom break by a supervisor, if requested. RMO2 states a fixed post requiring long periods of standing was not a new element of the job as it was inherent in Liberty operations and had been for years. She states Complainant never expressed a concern about not being able to take a restroom break. ROI, Exhibit F-3, pp. 288—300.

RMO2 states Complainant was informally accommodated during his ankle recovery, as they have in the past with all Rangers needing temporary consideration (*i.e.* knee surgery, etc.). She states they assigned Complainant to sitting positions, and when he said sitting all day was not good for his ankle, they assigned him positions where he could sit or stand. She states Complainant then said he should also be able to walk around a little; accordingly, whenever possible, they assigned him to a post where he had the option of sitting, standing, or walking around a little. She states when Complainant asked to be reassigned back to Ellis Island, due to its lack of fixed posts being better for his ankle recovery, she spoke to her supervisor, RMO1, and Complainant was reassigned back to Ellis Island. She states Complainant remained at Ellis Island until a 16E harassment case was filed against him, after which he was reassigned back to Liberty Island. ROI, Exhibit F-3, pp. 300—302.

**Whether Complainant was subjected to harassment and/or disparate treatment against on the basis of sex (male), disability (physical), age (YOB: 1960) and reprisal (prior EEO activity) when the following events occurred:**

5. **In February 2019, Complainant felt threatened and intimidated when RMO2 commented "this is not over yet, there will be disciplinary action;"**

**Complainant** states this incident occurred after he "won" his grievance and his leave and money were restored. He states he told RMO2 the grievance had been resolved, and he was getting all his money back. He states RMO2 then made the statement at issue. He believes RMO2 was telling him that management was "coming after him." He states a year later, he received a two-week suspension. He states at this point, he told RMO2 he wanted to go work somewhere else (return to Ellis Island). Complainant states no one witnessed the comment at issue, as it occurred were in RMO2 office. He states RMO2 never gave him a reason why she made the comment. ROI, Exhibit F-1, pp. 105—107.

**RMO1** states Complainant's grievance was not filed in a timely manner and Complainant claiming he won the grievance was false. He states Complainant was reimbursed for his time during the government shutdown. ROI, Exhibit F-2, p. 265.

**RMO2** states she has no knowledge of this conversation and does not know what Complainant is referencing. RMO2 states Complainant did not speak to her about this incident. She states she was not aware of any employees expressing their feelings of being threatened or intimidated by leadership. ROI, Exhibit F-3, p. 282.

Final Agency Decision
*David J. McCutcheon v. Debra Haaland, Secretary, U.S. Department of the Interior*
Agency Case No. DOI- NPS-19-0730

**RMO3** states he has no knowledge of this incident or allegation; however, in reviewing the time and attendance record in April 2019, the time charged to AWOL was still on the record. He states Complainant may have mistaken a lump sum pay disbursement made at the end of the 2018-2019 government shutdown as restored leave; however, it was not related to Complainant's grievance. ROI, Exhibit F-4, p. 321.

**Whether Complainant was subjected to harassment and/or disparate treatment against on the basis of sex (male), disability (physical), age (YOB: 1960) and reprisal (prior EEO activity) when the following events occurred:**

      **6. On March 20, 2019, Complainant felt intimidated when management issued Complainant a Memorandum, Use of Ellis Island for Employee Fitness and on April 4, 2019, the Supervisor Park Ranger issued Complaint another Memorandum, No Contact Letter; and**

**Complainant** states he felt intimidated, because he was no longer allowed to work at Ellis Island; he felt he was being targeted, and they were "trying to get rid of him." ROI, Exhibit F-1, p. 137. He states their first memorandum indicated he was observed running laps around the great hall at Ellis Island, while visitors were there, and this was not true. He states before work hours staff would often run laps as part of their fitness training. He states once visitor hours started; they would use the gym. ROI, Exhibit F-1, pp. 137—138.

Complainant states after this, he received the second memorandum indicating he could not be on Ellis Island at all (he could not work or exercise on Ellis Island), furthering their (management) intimidation. He states the memoranda were written by RMO3. Complainant states his belief that RMO1 directed RMO3 to write the memoranda. ROI, Exhibit F-1, p. 139.

**RMO1** states they issued the memorandums because they were attempting to limit the interaction between Complainant and Witness1, who felt threatened and was fearful of Complainant. He states Complainant was told he could be at Ellis Island to exercise when Witness1 was not working. He states Witness1 was also issued a No Contact Letter. He states Complainant filed a harassment complaint against him and RMO2, so his involvement was limited, and he had to recuse himself from these incidents. He states RMO3 issued the memoranda as a result. ROI, Exhibit F-2, p. 271.

**RMO2** states Complainant was issued these memoranda pursuant to a 16E complaint filed against him. She states this was done in order to separate the two employees. She states the other employee who said she was afraid of Complainant was also issued a No Contact Letter. She states she did not issue these memoranda but understood and supported the actions taken and trusted they followed 16E protocol. She states Complainant did not speak to her in detail regarding this, except to express he was not happy with it. ROI, Exhibit F-3, p. 280.

**Whether Complainant was subjected to harassment and/or disparate treatment against on the basis of sex (male), disability (physical), age (YOB: 1960) and reprisal (prior EEO activity) when the following events occurred:**

Final Agency Decision
*David J. McCutcheon v. Debra Haaland, Secretary, U.S. Department of the Interior*
Agency Case No. DOI- NPS-19-0730

7. **On or about August 14, 2019, Management video recorded Complainant's entrance and exits from the Park;**

**Complainant** states he found out management was filming him entering and exiting the boat. He states management told him it came to their attention he was leaving early; however, he was doing what everyone else was doing and following Park practices. He states they never knew exactly when the boat was coming. He states many of the Rangers left early to meet the boat. He states even RMO2 understood this, and believed in giving some leeway; however, RMO1 did not. Complainant states they (management) later used this to justify the 14-day Suspension Letter. He states management never told him they were recording him or investigating when he left work as there was no communication whatsoever. ROI, Exhibit F-1, p. 152.

**RMO3** states the Statue of Liberty is an iconic landmark and afforded a high degree of security by the U.S. Park Police; as such, Liberty Island is covered by video surveillance. He states Park management did not specifically record Complainant's entrances and exits to the park as the movement of all staff, visitors, contractors, concessioners, and arrivals and departures on Liberty Island, and in the Statue, Museum and Information Center were subject to video coverage. He states there was an action taken to confirm a June 4, 2019 allegation Complainant boarded a ferry departing Liberty Island before the end of his shift. He states a request was made of the U.S. Park Police to view a segment of video coverage of passengers boarding at that time, and Complainant was observed boarding the ferry before the end of his shift. He states neither he nor anyone under his supervision recorded Complainant on the date in question or at any other time. He states Complainant was asked about this during a formal discussion to gather information for possible disciplinary action. ROI, Exhibit F-4, pp. 330—331.

RMO3 states on August 20, 2019, he conducted a formal meeting and interview with Complainant, and Complainant was asked about this time and attendance issue. He states the meeting was intended to obtain Complainant's account of this and two other incidents, as part of an investigation. He states Complainant was advised in an email on August 19, 2019, the discussion had the potential to lead to disciplinary action, and he was entitled to have union representation. He states a Union Representative was present for the formal discussion. He states he was not aware of any others who experienced similar circumstances. ROI, Exhibit F-4, pp. 330—331.

**Whether Complainant was subjected to harassment and/or disparate treatment against on the basis of sex (male), disability (physical), age (YOB: 1960) and reprisal (prior EEO activity) when the following events occurred:**

8. **On January 10, 2020, the RMO1 issued Complainant a Memorandum, Advanced Written Notice of Proposed 14-Day Suspension.**

**Complainant** states RMO3 and RMO1 subjected him to this action (memorandum). He states he was issued the suspension for four charges; AWOL, Failure to Follow Leave Procedures, Conduct Unbecoming, and Failure to Follow Instructions. He believes he received this letter to force him to retire. He states this action made him wonder if it would just be best if he retired. ROI, Exhibit F-1, p. 155.

Final Agency Decision
*David J. McCutcheon v. Debra Haaland, Secretary, U.S. Department of the Interior*
Agency Case No. DOI- NPS-19-0730

Complainant believes management felt he could not properly do the job; instead of accommodating his issues, they would rather get rid of him. He states his evaluations were always high over the years, even during this time; he has never had a low performance rating and was always above "satisfactory." ROI, Exhibit F-1, pp. 156—157.

**RMO1** states he is unaware of the specifics of this allegation and cannot speak to it. He states he never issued Complainant an Advance Written Notice of Proposed 14-Day Suspension as RMO3 issued the memorandum. He believes this was based on Complainant's AWOL, the incident with Witness1, and a discourteous conduct complaint from a visitor. He states he was not the Deciding Official on this action. ROI, Exhibit F-2, p. 272.

**RMO2** states she was not involved in the issuance of this Proposed Suspension and cannot speak to it in detail. She states RMO1 did not issue this Notice; once Complainant brought a case against them, they were advised to recuse themselves from any and all disciplinary matters involving him. ROI, Exhibit F-3, p. 299.

**RMO3** states in March 2019, he was asked to investigate several incidents of inappropriate conduct by Complainant, including his unexcused leave in December 2018, the January 2019 harassment complaint (returned from NPS suggesting it may be cause for disciplinary action), and a December 2018 incident based on a visitor complaint that Complainant had responded in a rude manner when he accidentally nicked a visitor with his scissors while removing her Crown admission wrist band. He states on January 10, 2020, he issued Complainant the Proposal and very briefly explained the process for responding to it. ROI, Exhibit F-4, pp. 335—336.

RMO3 states in investigating the issues listed in the Proposal, he believed them to be reasonable and justified. He states there were clear issues of inappropriate conduct and discourteous behavior towards coworkers and staff that needed to be brought to attention and addressed with Complainant. ROI, Exhibit F-4, pp. 335—336.

### *Complainant's Rebuttal*

Complainant was offered the opportunity to provide a rebuttal to management's testimony; however, he did not provide rebuttal testimony.

### *Documentary Evidence*

Included in the documentary evidence is Complainant's Position Description, Park Ranger I, GS-0025-09. ROI, Exhibit F-7, pp. 356 – 358.

Included in the documentary evidence is documentation from RMO1 stating Complainant did not provide medical documentation to the Agency concerning a disability. ROI, Exhibit F-9, pp. 408 – 409.

Included in the documentary evidence is the Advance Written Notice of Proposed 14-Day Suspension issued to Complainant, dated January 10, 2020 ("the Advance Notice"). The Advance Notice had four charges. Complainant was charged with: (1) AWOL; (2) Complainant was charged

Final Agency Decision
*David J. McCutcheon v. Debra Haaland, Secretary, U.S. Department of the Interior*
Agency Case No. DOI- NPS-19-0730

with failure to follow leave procedures; (3) Complainant was charged with conduct unbecoming of a Federal employee stemming from his conduct which resulted in harassment allegation from Witness1 and an incident where Complainant cut a visitor's wrist with scissors when attempting to remove a band from their wrest and was "rude and unapologetic" after the incident; and (4) Complainant was charged with failure to follow instructions. ROI, Exhibit F-11, pp. 408 – 409.

Complainant's Rebuttal and Union Response to the Advance Written Notice of Proposed 14-Day Suspension, dated January 10, 2020. ROI, Exhibit F-12, pp. 408 – 409. In his reply, Complainant alleged he was being subjected to reprisal based upon his EEO activity, the Agency failed to accommodate his reasonable accommodation, and that he did not subject Witness1 to harassment, as alleged. ROI, Exhibit F-12, pp. 470 – 484.

Included in the documentary evidence are documents which the Agency contends supported management's decisions and conduct in this matter. These documents contain management notes regarding Complainant's AWOL status and documentation provided regarding the anti-harassment complaint filed against Complainant by Witness1. ROI, Exhibit F-14, pp. 535—598.

Included in the documentary evidence is the Absence and Leave Handbook and Article 12, Collective Bargaining Agreement, Section 1 – Annual Leave. ROI, Exhibit F-15, pp. 598—630.

Included in the documentary evidence is DOI, DM-752-370; Discipline and Adverse Actions. ROI, Exhibit F-16, pp. 638—666.

Included in the documentary evidence is Director's Order #16E: National Park Service Anti-Harassment Policy. ROI, Exhibit F-17, pp. 668—675.

Included in the documentary evidence is Director's Order is Director's Order #16D: Equal Employment Opportunity and Zero Tolerance of Discrimination. ROI, Exhibit F-18, pp. 678—685.

## IV.    <u>Legal Analysis</u>

## <u>LEGAL AUTHORITY</u>

The law prohibiting discrimination based on sex is Title VII. *See* Pub. L. 88-352. The law prohibiting discrimination based on age is the ADEA. *See* Pub. L. 90-202. The law prohibiting discrimination based on disability is the Rehabilitation Act. *See* Pub. L. 93-112. These laws prohibit an Executive Agency from discriminating against an individual because of that individual's race, color, age, and disability status. Federal sector EEO regulations are set out in 29 C.F.R. Part 1614.

## DISCUSSION

### A. Harassment

This harassment complaint arises under Title VII, the ADEA, and the Rehabilitation Act. Harassment of an employee that would not occur but for the employee's race, color, age, and/or disability status is unlawful if it is sufficiently patterned or pervasive. *Adorno v. U. S. Postal Serv.,* EEOC Appeal No. 01A32235 (Mar. 11, 2004); EEOC Enforcement Guidance on *Harris v. Forklift Systems, Inc.* at 3, 9 (Mar. 8, 1994); *Watson v. U.S. Postal Serv.*, EEOC Appeal No. 01A12280 (June 20, 2002). A single incident or group of isolated incidents will not be regarded as discriminatory harassment unless the conduct is severe. *Walker v. Ford Motor Co.,* 684 F.2d 1355, 1358 (11th Cir. 1982). Whether the harassment is sufficiently severe to trigger a violation of Title VII must be determined by looking at the totality of the circumstances, including: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating or merely an offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *See Harris v. Forklift Systems,* 510 U.S. 17 (1993). No single factor is determinative. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787-88 (1998). Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir. 2001).

In order to establish a *prima facie* case of discriminatory and/or retaliatory harassment, a complainant must show: (1) she/he is a member of a statutorily protected class; (2) s/he was subjected to unwelcome verbal or physical conduct; (3) the conduct complained of was based upon his/her protected class(es); (4) the conduct had the purpose or effect of unreasonably interfering with his/her work performance and/or creating an intimidating, hostile, or offensive work environment; and (5) there is a basis for imputing liability to the agency. *See Buster D. v. Dep't of the Interior*, EEOC Appeal No. 0120142369 (July 13, 2016); *Humphrey v. U.S. Postal Serv.*, EEOC Appeal No. 01965238 (Oct. 16, 1998); *LaCombe v. Dep't. of Veterans Aff.*, EEOC Appeal No. 01A23543 (Mar. 24, 2004); *DeMarco v. Dep't of Justice*, EEOC Appeal No. 0120113200 (Nov. 29, 2011).

With respect to element (5), an employer is subject to vicarious liability for harassment when the harasser is a supervisor with immediate (or successively higher) authority over the employee. However, where the harassment does not result in a tangible employment action (*e.g.*, a discharge, demotion, or undesirable reassignment), the agency can raise an affirmative defense, which is subject to proof by a preponderance of the evidence, by demonstrating: (1) that it exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) that the complainant unreasonably failed to take advantage of any preventative or corrective opportunities provided by the agency or to avoid harm otherwise. *See Sheila I. v, Dep't of Homeland Security,* EEOC Appeal No. 0120161053 (Oct. 26, 2017)*; see also Burlington v. Ellerth*, 524 U.S. 742, 760-65 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); Enforcement Guidance: Vicarious Liability for Unlawful Harassment by Supervisors, EEOC Notice No. 915.002 (June 18, 1999).

Final Agency Decision
*David J. McCutcheon v. Debra Haaland, Secretary, U.S. Department of the Interior*
Agency Case No. DOI- NPS-19-0730

In *Quinn v. U.S. Postal Service*, the EEOC outlined five ways an agency could rebut a *prima facie* case of harassment. EEOC Request No. 05900546 (Aug. 23, 1990). The EEOC found the agency could avoid liability by showing: (1) the alleged conduct did not occur; (2) the conduct at issue was not "unwelcome"; (3) the alleged harassment was not "sufficiently severe or pervasive" to create a hostile work environment; (4) immediate and appropriate corrective action was taken to address the harassment; and/or (5) there is no basis for imputing liability to the employer under agency principles. *Id.*

A harassment claim should include personal slurs or other denigrating or insulting verbal or physical conduct relating to an individual's protected category. *Meyer v. Dep't of Agriculture*, EEOC Appeal No. 0120082537 (Oct. 15, 2008) (finding no harassment given absence of unwelcome personal slurs or other denigrating or insulting verbal or physical conduct). "Harassment, as the term is used in Title VII cases, refers to more than being subjected to stress." *Lin v. U.S. Postal Serv*. EEOC Appeal No. 01932880 (1993). The employment discrimination statutes are not intended to be a "general civility code for the American workplace." *Oncale v. Sundowner Offshore Service, Inc.*, 523 U.S. 75, 76 (1998). Moreover, a complainant must show that the actions were such that they created a hostile work environment. *Ng v. Secretary of Transport.*, EEOC Appeal No. 01A21421 (July 7, 2003). The EEOC has held that if the actions alleged are common workplace occurrences, unless it is established that the actions were somehow abusive or offensive and were taken in order to harass complainant on the basis of any of his protected classes, such everyday events are not sufficiently severe or pervasive as to constitute actionable harassment. *Lynch v. U.S. Postal Serv.*, EEOC Appeal No. 01981027 (July 16, 1999). Whether an objectively hostile or abusive work environment exists is based on whether a reasonable person in the complainant's circumstances would have found the alleged behavior to be hostile or abusive. *Harris*, 510 U.S. 17 (1993). Evidence of the general working atmosphere involving employees other than a complainant is also relevant to the issue of whether a hostile work environment exists. *See Vinson v. Taylor*, 753 F.2d 141 (D.C. Cir. 1985), *aff'd in relevant part and rev'd in part*, *sub nom Meritor Federal Savings Bank v. Vinson*, 477 U.S. 57 (1986); *Delgado v. Lehman*, 665 F. Supp. 460 (E.D. Va. 1987).

In regard to the harassment allegation, we note that a harassment claim should include personal slurs or other denigrating or insulting verbal or physical conduct relating to an individual's protected category. *See* 29 C.F.R. 1606.8 (national origin discrimination); *Meyer v. Dep't of Agriculture*, EEOC Appeal No. 0120082537 (Oct. 15, 2008) (finding no harassment given absence of unwelcome personal slurs or other denigrating or insulting verbal or physical conduct). "[I]nsofar as [p]laintiff attempts to base his hostile work environment claim on his [compressed work schedule] revocation and AWOL charge, he cannot simply regurgitate his disparate treatment claims in an effort to flesh out a hostile work environment claim." *Franklin v. Potter*, 600 F. Supp. 2d 38, 76–77 (D.D.C. 2009). Allowing standard disparate treatment claims to be converted into harassment claims would "blur the distinctions between both the elements that underpin each cause of action and the kinds of harm each cause of action was designated to address." *Rattigan v. Gonzalez*, 503 F. Supp. 2d 56, 82 (D.D.C 2007), quoting *Parker v. State Dep't fo Pub. Safety*, 11 F. Supp. 2d 467, 475 (D. Del. 1998).

In order to have discrete personnel actions included in a hostile environment claim, the complainant must make some showing that the actions were hostile or offensive, or part of an

Final Agency Decision
*David J. McCutcheon v. Debra Haaland, Secretary, U.S. Department of the Interior*
Agency Case No. DOI- NPS-19-0730

overall pattern of harassment. In *Goines v. Secretary of Veterans Affairs*, EEOC Appeal No. 01A54108 (July 20, 2006), the complainant made a hostile environment claim, including such discrete personnel actions as a negative performance counseling, denial of a request for a change in supervision as an accommodation, and a formal warning on sick leave usage. The Commission, in *Goines*, held:

> We find that complainant failed to establish that he was subjected to a hostile work environment as he alleged. Specifically, […] the Commission notes that the substance of complainant's allegations concern personnel actions, and complainant presents no evidence that any of the above actions were objectively offensive, abusive or hostile, and otherwise taken in order to harass him. The actions alleged are common workplace occurrences, and unless it is reasonably established that the actions were somehow abusive or offensive, and were taken in order to harass complainant on the basis of any of his protected classes, such everyday events are not sufficiently severe or pervasive so as to offend the general sensibility of an individual experiencing such occurrences in the workplace. *See Wolf v. U.S. Postal Serv.*, EEOC Appeal No. 01961559 (July 23, 1998). *See also Long v. Veterans Admin.*, EEOC Appeal No. 01950169 (Aug. 14, 1997); *Bennett v. Dep't of the Navy*, EEOC Request No. 05980746 (Sept. 19, 2000).

"The threshold for establishing retaliatory harassment is different than for discriminatory hostile work environment. Retaliatory harassing conduct can be challenged under the *Burlington Northern* standard even if it is not severe or pervasive enough to alter the terms and conditions of employment. If the conduct would be sufficiently material to deter protected activity in the given context, even if it were insufficiently severe or pervasive to create a hostile work environment, there would be actionable retaliation." *Michale V. v. Dep't of the Interior*, EEOC Appeal No. 0120143043 (Apr. 20, 2018) citing *EEOC Enforcement Guidance on Retaliation and Related Issues*, No. 915.004, Sect. II.B, e.g. 17.

### 1. Membership in a Protected Class

Here, Complainant has established that he is in a protected class with regard to sex by virtue of being male. In addition, Complainant has established that he is in a protected class with regard to age as he has established he is over 40 (Complainant's YOB is 1960). While the record does not contain medical documentation regarding Complainant's disability status, we will assume *arguendo* that Complainant has established that he is a person with a disability based upon his stated issue with his left foot and his statements that he suffers from PTSD. Furthermore, we find that Complainant has established that he has engaged in prior protected activity based upon EEO complaints which were filed in March 2014 and August 2019 (the instant complaint). Therefore, we find Complainant has established his membership in a protected class with respect with sex, age, disability, and prior protected activity.

### 2. Unwelcome Conduct

Complainant alleged several instances of unwelcome conduct.

Final Agency Decision
*David J. McCutcheon v. Debra Haaland, Secretary, U.S. Department of the Interior*
Agency Case No. DOI- NPS-19-0730

Complainant alleged that management denied his annual leave requests, threatened to charge him with AWOL, and then subsequently charged him with AWOL. RMO2 stated that she did warn Complainant he would be classified as AWOL if he did not report to duty after his leave request was denied due to insufficient operational coverage and staffing levels. RMO2 further stated that she classified Complainant's unapproved leave as AWOL. Therefore, we find that these allegations occurred as alleged.

Complainant alleged that RMO1 reassigned him from his duty station at Ellis Island to work at Liberty Island. RMO1 stated that Complainant was reassigned to Liberty Island as a protective measure taken in light of a harassment allegation made against Complainant by Witness1. Therefore, we find that these allegations occurred as alleged.

Complainant alleged that RMO2 assigned him to a fixed post that required long periods of standing and where a restroom was not available. RMO2 stated many of the posts for Rangers were fixed posts, requiring long periods of standing. She further stated that during the time Complainant expressed concern over his ankle he was assigned to posts where he could either sit or stand and walk around. RMO2 stated none of the posts had a restroom immediately available, or were adjacent to a restroom; however, there were no posts where a Ranger could not take a restroom break if they requested. Therefore, we find that this allegation occurred as alleged. However, we note that the record does not reflect that Complainant was denied access to the restroom.

Complainant alleged that he felt threatened and intimidated when RMO2 commented "this is not over yet, there will be disciplinary action." RMO2 denies making this comment. There is no evidence in the record that suggests RMO2 lacks credibility. Therefore, we find that there is insufficient evidence to establish this allegation occurred as alleged.

Complainant alleged that he felt intimidated when management issued the memorandum regarding use of Ellis island fitness facilities and when he was issued the No Contact Letter. The record reflects that both incidents occurred as alleged.

Complainant alleged that management recorded his entrance and exits from the Park via the Park's video security system. The record reflects that management reviewed video footage of the Park to determine the times Complainant was entering and exiting the Park. Therefore, we find the record reflects that this allegation occurred as alleged.

Complainant alleged that RMO3 issued him an Advanced Written Notice of Proposed 14-Day Suspension. The record reflects that this incident occurred as alleged.

We find that a reasonable person in Complainant's circumstances would find the substantiated alleged conduct unwelcome.

### 3. Conduct Based on Membership in Protected Classes

ODICR finds that Complainant failed to establish that conduct that he was subjected to relates in any way to his membership in a protected class as the record is devoid of any evidence of discriminatory *animus* based upon Complainant's sex, age, disability status, or prior protected

Final Agency Decision
*David J. McCutcheon v. Debra Haaland, Secretary, U.S. Department of the Interior*
Agency Case No. DOI- NPS-19-0730

activity. Complainant asserted that based on his protected classes, RMO1 and RMO2 subjected him to a hostile work environment. However, we find that complainant has not shown that he was subjected to harassment in the form of unwelcome verbal or physical conduct involving his protected classes, or the harassment complained of was based on his statutorily protected classes. While Complainant has cited multiple incidents where his supervisors have either inappropriately acted or taken actions that were either adverse or disruptive to him, we find that Complainant fails to show that these incidents were as a result of Complainant's membership in a protected class.

### 4. Severity or Pervasiveness

Complainant also has not demonstrated that the unwelcome conduct he was subjected to was so severe or pervasive as to create a hostile work environment. We have viewed the totality of the claims and find that the management's actions constituted a legitimate response to Witness1's complaint of harassment raised against Complainant, and to the Agency's responsibility, under Title VII and the EEO regulations, to take prompt remedial action upon learning of harassment. In addition, there were legitimate concerns regarding Complainant's conduct that warranted management's response. For instance, Complainant failed to report to duty upon learning that his requested leave had been denied—even after warnings that doing so would result in him being classified as AWOL. In addition, there were serious concerns about Complainant's conduct and interaction with park guest. Complainant cut a guest wrist with scissors when taking off a bracelet and failed to apologize or act in a professional manner after the incident. Therefore, we find that Complainant failed to establish that he was subjected to a hostile work environment.

### B. Disparate Treatment

A complainant may recover for a discrete act that is found to be discriminatory if the discrete act was raised to an EEO Counselor within forty-five (45) days of its occurrence. If the discrete act was not timely raised but is alleged as part of a hostile work environment claim, it may be used to determine the extent of the agency's liability for the hostile work environment claim. However, a complainant cannot recover for the specific discrete act if it is not timely raised. *Hill v. Dep't of the Army*, EEOC Appeal No. 01A60228 (March 21, 2006). Here, ODICR finds that Complainant being issued the notice of the 14-day suspension and being video recorded by management were timely raised discreate acts; therefore, Complainant's allegations will be analyzed under a disparate treatment analysis. *See Hill v. Dept. of the Army*, EEOC Appeal No. 01A60228 (March 21, 2006) (discrete acts include such incidents as termination, failure to promote, denial of transfer, or refusal to hire).

In order to sustain a claim of employment discrimination, a complainant may present two forms of evidence. One form is direct evidence of discrimination, which has been defined as an action or statement of an employer which reflects a discriminatory or retaliatory attitude and which correlates to the challenged act. *Chambers v. Dep't of the Treasury*, EEOC Appeal No. 0120064530 (Feb. 27, 2009).

In the absence of direct evidence, a claim of discrimination is examined under the three-part analysis originally enunciated in *McDonnell Douglas Corp. v. Green*. 411 U.S. 792 (1973). A complainant must first establish a *prima facie* case of discrimination by presenting facts that, if

Final Agency Decision
*David J. McCutcheon v. Debra Haaland, Secretary, U.S. Department of the Interior*
Agency Case No. DOI- NPS-19-0730

unexplained, reasonably give rise to an inference of discrimination, *i.e.*, that a prohibited reason was a factor in the adverse employment action. *McDonnell*, 411 U.S. at 802; *Furnco Construction Corp. v. Waters*, 438 U.S. 567 (1978). The agency must then articulate a legitimate, nondiscriminatory reason for its action(s). *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). After the agency has offered the reason for its action, the burden of production returns to the complainant to prove, by a preponderance of the evidence, that the agency's reason was pretextual, that is, it was not the true reason or the action was influenced by legally impermissible criteria. *Burdine*, 450 U.S. at 253; *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993). "Pretext means more than a mistake on the part of the employer; [pretext] 'means a lie, specifically a phony reason for some action.'" *Wolf v. Buss (America) Inc.*, 77 F. 3d 914, 919 (7th Cir. 1996). At all times, the complainant bears the ultimate responsibility to persuade the fact finder by a preponderance of the evidence that the agency acted on the basis of a prohibited reason. *Id.* It is not sufficient "to *disbelieve* the employer; the fact finder must *believe* the plaintiff's explanation of intentional discrimination." *St. Mary's Honor Center*, 509 U.S. at 519 (emphasis in original).

Protected activity includes "participating" in an EEO process or "opposing" discrimination. EEOC Enforcement Guidance on Retaliation and Related Issues (2016). The protection offered by the participation clause extends to all parts of the EEO complaint process, including filing an informal complaint and acting as a witness for either side in an administrative proceeding. *Id.* The participation clause is generally interpreted broadly regardless of whether an individual has a reasonable, good faith belief that the underlying allegations are, or could become, unlawful conduct. *Id.*; *see Johnson v. Mayor and City of Bolivar, Tenn.*, EEOC Appeal No. 11980023 (June 28, 2001) (stating that the complainant's protected activity was "participation" rather than "opposition" so there was no need to examine the question of whether the complaint was filed in good faith).

To establish a causal connection between an individual's involvement in protected EEO activity and an agency action, a complainant must be able to establish that one or more officials involved in deciding upon or executing the adverse personnel action were aware of the individual's participation in protected EEO activities. *Mason v. Tennessee Valley Authority*, EEOC No. 01840126 (Dec. 31, 1984).

To prove a causal link or nexus between the adverse treatment and the prior protected EEO activity, a complainant may show that there was only a short amount of time between the protected activity and the adverse action (usually fewer than three or four months). *Clark County School District v. Breeden*, 532 U.S. 268, 273-74 (2001) (holding that, in retaliation cases relying solely on temporal proximity to establish causation, "the temporal proximity must be 'very close'"); *McFarlane v. U.S. Postal Serv.*, EEOC Appeal No. 0120070490 (Aug. 28, 2008) (citing *Breeden* for the proposition that a three-month interval is too long to establish causation); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10 111 Cir. 1997) (finding a three-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174 (7th Cir. 1992) (finding four-month period insufficient). A nexus may be shown despite a significant gap in time between the prior protected activity and the adverse treatment where a responsible management official in a previous complaint has had continuous close involvement in that previous complaint. *Moss v. Dep't of Defense*, EEOC Appeal No. 01913531 (Jan. 27, 1992) (stating that the complainant was able to establish a *prima facie* case of retaliation despite a two-year gap between the complainant's prior EEO activity and her non-

Final Agency Decision
*David J. McCutcheon v. Debra Haaland, Secretary, U.S. Department of the Interior*
Agency Case No. DOI- NPS-19-0730

selection because the selecting official was continuously closely involved with the complainant's prior protected activity).

The Rehabilitation Act prohibits employment discrimination against otherwise qualified federal employees on the basis of a disability. 29 U.S.C. § 794(a). The standards for determining a violation of the Rehabilitation Act, as amended, are the same as those for a violation of the Americans with Disabilities Act (ADA). 29 U.S.C. § 794(d); 29 C.F.R. § 1614.203(b); *see also* 42 U.S.C. § 12101, *et seq.*[7] The Rehabilitation Act "constitutes the exclusive remedy for a federal employee alleging disability-based discrimination." *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007).

In analyzing a disparate treatment claim under the Rehabilitation Act, where there is no direct evidence of disability discrimination, we similarly apply the burden-shifting method of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

As a threshold matter, a complainant must establish that s/he is an individual with a disability. An individual with a disability is one who: (1) has a physical or mental impairment that substantially limits a major life activity; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. 29 C.F.R. § 1630.2(g)(1). A physical or mental impairment means:

    (1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or

    (2) Any mental or psychological disorder, such as an intellectual disability (formerly termed "mental retardation"), organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h). Some types of impairments will "virtually always be found to impose a substantial limitation on a major life activity." In these cases, the "necessary individualized assessment should be particularly simple and straightforward." 29 C.F.R. § 1630.2(j)(3)(ii). Examples of such impairments include but are not limited to deafness, intellectual disability, missing limbs, major depressive disorder, and post-traumatic stress disorder. 29 C.F.R. § 1630.2(j)(3)(iii).

Major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. 29 C.F.R. § 1630.2(i)(1). Sitting, reaching, and interacting with others are also considered major life activities. *Id*. Major life

---

[7] In September 2008, Congress amended the Americans with Disabilities Act (ADA) by enacting the Americans with Disabilities Act Amendments Act of 2008 (ADAAA), effective as of January 1, 2009, "to restore the intent and protections of the Americans with Disabilities Act of 1990." Pub. L. No. 110-325, 122 Stat. 3553 (2008). The ADAAA was the legislative response to a series of Supreme Court cases that had narrowed the class of individuals protected by the ADA. Thus, among other things, the ADAAA expanded the class of individuals to be protected by providing a more expansive definition of "disability."

Final Agency Decision
*David J. McCutcheon v. Debra Haaland, Secretary, U.S. Department of the Interior*
Agency Case No. DOI- NPS-19-0730

activities also include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." *Id*. Functions of the special sense organs and skin, as well as genitourinary, cardiovascular, hemic, lymphatic, musculoskeletal functions are also major life activities. *Id*.

Next, a complainant must show that s/he is a "qualified" individual with a disability, who satisfies the requisite skill, experience, education, and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position. 29 C.F.R. § 1630.2(m). The term "essential functions" generally means the fundamental job duties of the employment position the individual with a disability holds or desires. 29 C.F.R. § 1630.2(n)(2). Essential functions of a position must be distinguished from the methods of achieving those functions. For example, time and attendance are considered the methods by which an employee accomplishes the duties of a job and thus are not considered essential functions of a position. *Gilberto S. v. Dep't of Homeland Security*, EEOC Appeal No. 0320110053 (July 10, 2014).

### 1. *Prima Facie* Case – Sex

A *prima facie* case of discrimination under Title VII is established where a complainant has produced sufficient evidence to show that: (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; and (3) similarly situated employees outside his protected class were treated more favorably in like circumstances. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To be actionable, there must be evidence that the alleged adverse employment action materially changes the terms and conditions of employment and is more than an inconvenience or a change in job responsibility. *See Mattern v. Eastman Kodak*, 104 F.3d 702, 707 (5th Cir. 1997).

Here, Complainant has established that he is a member of a protected class with regard to sex as the record indicates Complainant identifies as a male. Complainant has also established that he was subjected to an adverse employment action when he was issued a 14-day suspension and when he was video-recorded by management on the Park's video monitoring system. However, Complainant has not identified any similarly situated employee outside of his protected class who received treatment that is more favorable, nor has he alleged any other facts giving rise to an inference of discrimination. *See Huang v. U.S. Postal Serv.*, EEOC Appeal No. 01A01175 (April 11, 2002). Complainant therefore has not established a *prima facie* case of discrimination based on sex. However, we will assume, *arguendo*, that Complainant has established a *prima facie* case of sex discrimination.

### 2. *Prima Facie* Case – Age

Under the ADEA, a *prima facie* case of discrimination based on age is established where a complainant produces sufficient evidence to show that: (1) the complainant is at least 40 years old; (2) an adverse employment action occurred; and (3) a causal connection exists between the complainant's age and the adverse action. *See O'Connor v. Consolidated Coin Caterers Corp*. 517

Final Agency Decision
*David J. McCutcheon v. Debra Haaland, Secretary, U.S. Department of the Interior*
Agency Case No. DOI- NPS-19-0730

U.S. 308 (1996); *Complainant v. Def. Fin. & Accounting Serv.*, EEOC Appeal No. 0120132129 (May 7, 2015).

Here, Complainant has established that he is at least 40 years old because he was born in 1960. Complainant has also established that he was subjected to an adverse employment action when he was issued a 14-day suspension and when he was recorded by management on the Park's video monitoring system. However, Complainant has not provided evidence that would support a causal connection between his age and the adverse action to which he was subjected. A causal connection can be shown by identifying similarly situated employees outside of the complainant's protected class who did not receive the same treatment for engaging in similar behavior. Complainant did not identify any employee either below the age of 40 years or substantially younger than himself who received treatment that was more favorable. *See Complainant v. Social Sec. Admin*, EEOC Appeal No. 0120132084 (April 24, 2015). Moreover, Complainant alleged that he received 14-day suspension to "force him to retire." As evidence of this, he states that he was asked if he wanted to go to a retirement training and agreed to attend. He stated that in the retirement training it was said that if an individual is fired, they still get a pension and it made him wonder if it would be best if he just retired. This is insufficient evidence to demonstrate a causal connection between his age and the issuance of the 14-day suspension or video monitoring for purposes of establishing a *prima facia* case of age discrimination. Because Complainant has not demonstrated a causal connection between his age and the adverse action cited here, Complainant has not established a *prima facie* case of discrimination based on age. However, we will assume, *arguendo*, that Complainant has established a *prima facie* case of age discrimination.

## 3.   Prima Facie Case – Reprisal

To establish a *prima face* case of retaliation, a complainant must show that: (1) s/he engaged in a protected activity; (2) management was aware of the protected activity; (3) s/he suffered a materially adverse action; and (4) there is a causal connection between his/her protected activity and the materially adverse action. *Whitmire v. Dep't of the Air Force*, EEOC Appeal No. 01A00340 (Sept. 25, 2000). The EEOC has distinguished a Supreme Court decision regarding the evidentiary burden required by a complainant to prove a Title VII claim of retaliation; whereas a private sector complainant must prove that retaliation was the "but for" causation for discrimination (meaning the unlawful retaliation would not have occurred without the wrongful actions of the employer), a federal sector complainant must prove merely that retaliation was a motivating factor. *Petitioner v. Dep't of the Interior*, EEOC Appeal No. 0320110050 (July 16, 2014) (citing *U. of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013) for the proposition that private sector Title VII retaliation claims must be proven according to traditional principles of "but for" causation).

Here, Complainant established that he engaged in protected activity when he filed EEO complaints in March 2014 and the instant complaint in August 2019. However, RMO3 testified that they were not aware of Complainant's August 2019 complaint. Furthermore, Complainant established that he was subject to an adverse employment action when RMO3 issued him a 14-day suspension and when RMO3 reviewed video footage of Complainant recorded by the Park's video monitoring system. Complainant being recorded by the Park's video monitoring system occurred on August 14, 2019, or several days prior to him engaging in EEO activity on August 27, 2019. The 14-day

Final Agency Decision
*David J. McCutcheon v. Debra Haaland, Secretary, U.S. Department of the Interior*
Agency Case No. DOI- NPS-19-0730

suspension was issued in January 2020, or approximately five months after Complainant's EEO activity. Accordingly, Complainant can establish causal connection between his EEO activity and his issuance of a 14-day suspension based upon temporally proximity as this occurred approximately five months after his initial EEO contact in the instant complaint (August 2019). The video monitoring incident occurred prior to Complainant's August 2019 protected activity and approximately 5 years after his March 2014 activity; therefore, he cannot establish a causal connection regarding the video incident. Because Complainant cannot establish that RMO3 was aware of his protected activity when he issued Complainant a 14-day suspension, Complainant cannot establish a *prima facie* case of reprisal. However, we will assume, *arguendo*, that Complainant has established a *prima facie* case of age discrimination.

### 4. Prima Facie Case – Disability

While the record does not contain medical documentation regarding Complainant's disability status, we will assume, *arguendo*, that Complainant has established that he is "qualified" individual with a disability based upon his stated issue with his left foot and PTSD.

### 5. Management's Articulation

If a complainant meets the burden of presenting a *prima facie* case, Management then has a burden of production to articulate some legitimate, nondiscriminatory reason for its actions. *Burdine*, 450 U.S. 248. In order to meet its burden, Management need only show that it based its decision on a legitimate consideration and not on an illegitimate one. *Furnco*, 438 U.S. 567, 577. The Supreme Court stated in *Sweeney* that the defendant need not "prove absence of discriminatory motive." 439 U.S. 24, 25. Rather, the defendant need only "articulate some legitimate, nondiscriminatory reason for its action." *Id*. In *Burdine*, the Supreme Court held that the burden on the employer is to "produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." 450 U.S. 257. The evidence presented by Management need not establish Management's actual motivation. If Management meets this burden of production, the presumption of discrimination raised by the *prima facie* case is rebutted and drops from the case altogether. *Id*.

RMO3 stated a Supervisory Park Ranger had observed Complainant leaving his shift early; therefore, video footage obtained from the Park's video monitoring system was reviewed and Complainant was questioned about the day in question as part of an investigation into Complainant's conduct. Furthermore, RMO3 stated in March 2019, he was asked to investigate several incidents of inappropriate conduct by Complainant, including his unexcused leave in December 2018 (the AWOL classification), the January 2019 harassment complaint against Complainant brought by Witness1, and a December 2018 incident based on a visitor complaint that Complainant had responded in a rude manner when he accidentally nicked a visitor with his scissors while removing her Crown admission wristband. RMO3 stated on January 10, 2020, he issued Complainant the Proposal and very briefly explained the process for responding to it. RMO3 stated in investigating the issues listed in the Proposal, he found them to be reasonable and justified based on the available evidence. RMO3 stated there were clear issues of inappropriate conduct and discourteous behavior towards coworkers and staff that needed to be brought to attention and addressed with Complainant.

Final Agency Decision
*David J. McCutcheon v. Debra Haaland, Secretary, U.S. Department of the Interior*
Agency Case No. DOI- NPS-19-0730

The foregoing reasons are sufficiently clear and specific to afford Complainant a full and fair opportunity to demonstrate pretext. Accordingly, we find that management has articulated legitimate, nondiscriminatory reasons for its actions.

### 6. Pretext

Once the agency articulates a legitimate, nondiscriminatory reason for its disputed action, a complainant can still prevail on a disparate treatment claim by establishing that the explanation was pretext for discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "Pretext means more than a mistake on the part of the employer; [pretext] 'means a lie, specifically a phony reason for some action.'" *Wolf v. Buss (America) Inc.*, 77 F. 3d 914, 919 (7th Cir. 1996). At all times, the complainant bears the ultimate responsibility to persuade the fact finder by a preponderance of the evidence that the agency acted on the basis of a prohibited reason. *Id.* It is not sufficient "to *disbelieve* the employer; the fact finder must *believe* the plaintiff's explanation of intentional discrimination." *St. Mary's Honor Center*, 509 U.S. at 519 (emphasis in original). It is not enough for a complainant to merely question or doubt the integrity of the agency's explanation, s/he must set forth specific facts that would enable a fact finder to conclude that the reason given is not only a sham, but a sham to cover up management's real reason (and unlawful) motive(s). *See Morin v. Health and Human Serv.*, EEOC Appeal No. 0120073357 (Sept. 16, 2009); *Rosser v. Dep't of Transport.*, EEOC Request No. 05A00316 (Feb. 2, 2001). Pretext often is demonstrated by showing the record of the agency's actions contains "inconsistencies and discrepancies that render the agency's proffered explanation unworthy of credence." *Williams v. Dep't of Army*, EEOC Appeal No. 01842729 (July 9, 1986).

Here, Complainant stated his belief that RMO3's actions were due to his sex, age, disability, and prior EEO activity. However, Complainant failed to provide evidence to support this belief. Instead, as noted above, the available evidence in the record shows management's actions were a legitimate response to Witness1's complaint of harassment raised against Complainant, and to the Agency's responsibility, under Title VII and the EEO regulations, to take prompt remedial action upon learning of harassment. In addition, there were other legitimate concerns regarding Complainant's conduct, such as Complainant's unexcused leave (AWOL) in December 2018 and a December 2018 incident based on a visitor complaint that Complainant had responded in a rude manner when he accidentally nicked a visitor's wrist. The record provides credible evidence that this instance of misconduct alleged by management in the proposed notice of suspension occurred as alleged and warranted corrective action. Moreover, the record indicates the video recording incident occurred in response to concerns from a supervisory park ranger about Complainant's conduct relating to his time and attendance. Given the other substantiated allegations regarding Complainant's conduct, we find that the offered reason from management regarding this incident was legitimate and warranted in light of the circumstances.

There is no evidence in the record to corroborate Complainant's allegation that these actions were taken against him in an effort to force him to retire due to his age. Nor is there evidence that corroborate Complainant's allegation that he was subjected to discrimination based upon his sex, disability status, or prior protected activity. The record indicates that RMO3 was unaware of Complainant's protected activity when he conducted the investigation into Complainant's conduct or when he issued the 14-day suspension. Likewise, there is no indication that the 14-day

Final Agency Decision
*David J. McCutcheon v. Debra Haaland, Secretary, U.S. Department of the Interior*
Agency Case No. DOI- NPS-19-0730

suspension or the review of the video from the Park's video monitoring system was in any way connected to Complainant's disability-status, sex, or his age.

In sum, Complainant did not establish that management's articulated reasons were false or that management's actions were based on Complainant's on sex, age, disability, or reprisal, as alleged. Complainant retains the burden of proof to establish discrimination by a preponderance of the evidence. It is not sufficient "to *dis*believe the employer; the fact finder must *believe* the plaintiff's explanation of intentional discrimination." *St. Mary's Honor Center*, *supra* at 519 (emphasis in original). Complainant's subjective belief, however genuine, does not constitute evidence of pretext or provide a basis for remedial relief. *See Mroz v. Dep't of Defense*, EEOC Appeal No. 01A33187 (Jan. 23, 2004). An agency has broad discretion to carry out personnel decisions and should not be second-guessed by the reviewing authority absent evidence of unlawful motivation. *See Minor v. Dep't of Defense*, EEOC Appeal No. 0120064132 (Jan. 26, 2007). ODICR finds that Complainant failed to meet his burden to demonstrate that management's articulated reasons were pretext.

### V.    Statement of Conclusions

Based on a review of the record and the above analysis, ODICR finds that the preponderance of the evidence does not support Complainant's claims of unlawful discrimination. Accordingly, ODICR finds that Complainant failed to prove that he was subjected to harassment and/or disparate treatment based on sex, age, disability, or reprisal as alleged.

### VI.    Statement of Relief

Based on the aforementioned findings, no corrective action or attorneys' fees are warranted. This is the final decision of the U.S. Department of the Interior. If Complainant is dissatisfied with the decision, Complainant may exercise the following appeal rights.

### VII.    Statement of Notice and Rights

### APPEAL RIGHTS TO THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

Regulation 29 C.F.R., § 1614.402(a) states that an appeal of an agency's dismissal to the EEOC must be filed by an appellant within thirty (30) calendar days of receipt of an agency's decision. If the appellant is represented by an attorney of record, the thirty (30) calendar-day time limit shall begin to run from the date of receipt by the attorney of the notice of dismissal, final action, or final decision without a hearing.

You may request an appeal online via the EEOC Public Portal at:

https://publicportal.eeoc.gov/portal/

On the EEOC Public Portal, please be sure to indicate your specific Bureau/sub-component.

Final Agency Decision
*David J. McCutcheon v. Debra Haaland, Secretary, U.S. Department of the Interior*
Agency Case No. DOI- NPS-19-0730

For additional information on how to request an appeal through the EEOC Public Portal, visit the
EEOC Public Portal User's Guide – Vol 7, at:

https://www.eeoc.gov/sites/default/files/migrated_files/portal/V7-Appeals_to_the_EEOC.pdf

The appellant shall furnish a copy of the appeal to the Agency at the same time it is filed with the
EEOC. A copy of the appeal and any submissions in support thereof shall be forwarded to the
Agency at the following address:

> Erica D. White-Dunston, Esq.
> Director and Chief Diversity Officer
> U.S. Department of the Interior
> Office of Diversity, Inclusion and Civil Rights
> doicivilrights@ios.doi.gov

**Please note that, due to the COVID-19 pandemic, offices for the U.S. Department of the
Interior, Office of Diversity, Inclusion and Civil Rights are currently closed. However, our
staff remains available in telework status. Please do not send non-electronic correspondence
to our office at this time, as we are unable to retrieve hard copy mailings. If you are unable
to provide a copy of your appeal via email, please call 202-208-5693.**

If the appeal is not filed within the thirty (30) calendar-day time limit, the appeal may be dismissed
by the Commission. However, the Commission may, at its discretion, extend the time limits and
accept the appeal based upon a written statement that there was no actual notification of the time
limit, or that a timely Notice of Appeal could not be filed due to extenuating circumstances.

Any statement or brief in support of the appeal must be submitted to the Commission within thirty
(30) calendar days of filing of the Notice of Appeal. Any statement or brief in opposition to the
appeal must be submitted to the Commission and served on the appellant (or the attorney of record,
if represented by an attorney) within thirty (30) calendar days of receipt of the statement or brief
supporting the appeal or, if no statement or brief supporting the appeal has been filed, within sixty
(60) calendar days of receipt of the appeal.

It is the responsibility of the U.S. Department of the Interior to submit the entire complaint file to
the Commission, Office of Federal Operations, within thirty (30) calendar days of initial
notification that an appeal has been filed.

## CIVIL ACTIONS

The appellant also has the right to file a civil action in an appropriate U. S. District Court. If the
appellant decides to file a civil action, the appellant must file:

- Within ninety (90) calendar days of receipt of the Final Decision, if no appeal has been
  filed; or

Final Agency Decision
*David J. McCutcheon v. Debra Haaland, Secretary, U.S. Department of the Interior*
Agency Case No. DOI- NPS-19-0730

- Within ninety (90) calendar days of receipt of the EEOC's final decision on an appeal; or

- After 180 calendar days from the date of filing an appeal with the EEOC, if there has been no final decision by the EEOC.

If the appellant files a civil action involving this complaint, **the Appellant must specifically name DEBRA HAALAND, Secretary of the U.S. Department of the Interior, as defendant**. Failure to do so may result in the loss of any judicial redress to which the appellant may be entitled.

If the appellant decides to file a civil action and is unable to afford counsel, the Civil Rights Act gives the Court discretionary authority to appoint Counsel without payment of fees or costs by the appellant. The granting or denial of your request is within the sole discretion of the Court. The request and the civil action **must be filed within ninety (90) calendar days** of the date the final decision is received.

Please note that, "filing of a civil action under §1614.408 or §1614.409 shall terminate EEOC processing of the appeal. If private suit is filed subsequent to the filing of an appeal, the parties are requested to notify the Commission in writing."

Sincerely,

_____          _____04/14/2021_____
Erica D. White-Dunston, Esq.                              Date
Director and Chief Diversity Officer
Office of Diversity, Inclusion and Civil Rights

Encl:   2020 COVID-19 Processing Information for EEO Directors, dated April 6, 2020 (Revised)
        2020 COVID-19 Processing Information for EEO Directors, dated July 26, 2020

Cc:    Rose Blankenship, EEO Officer, NPS



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Office of Federal Operations**

**P. O. Box 77960**

**Washington, D.C.  20013**

April 6, 2020

<u>Memorandum</u>

TO:         Federal Sector EEO Directors & Officials

FROM:       Carlton M. Hadden
            Director, Office of Federal Operations

SUBJECT:    Processing Information for All Parties in Federal EEO Processing under 29 CFR Part 1614

In light of the National Emergency declared by the President due to the Coronavirus (COVID-19), the U.S. Equal Employment Opportunity Commission's (EEOC) Office of Federal Operations (OFO) is issuing the following instructions regarding the processing of federal sector EEO complaints covered by 29 CFR Part 1614.

The EEOC recognizes this crisis affects all federal employees, complainants, and others involved in the EEO process.  We appreciate the dedication of federal EEO professionals throughout the federal government and we further recognize that the centerpiece of our efforts are the employees, applicants, and former employees who believe they have experienced employment discrimination and access our regulatory process for assistance.  Nevertheless, the federal government remains open and committed to providing mission-critical services to the greatest extent possible, given the limitations inherent in the current environment.

The EEOC also recognizes that, because of the National Emergency, applicants who utilize the EEO complaint process may face challenges that preclude them from meeting the regulatory timeframes set forth in 29 CFR Part 1614.

The EEOC must balance its duty to ensure that the EEO process continues efficiently and effectively, without compromising the safety of federal employees or the rights or safety of complainants and others involved in the EEO process.

The EEOC expects that agencies and employees will continue to process EEO complaints in a timely manner that will best preserve the legal rights of the parties involved, unless doing so would interfere with mission-critical operations for an agency.  Accordingly, the Office of Federal Operations is issuing the following instructions, which will remain in effect until further notice:

1.  Agencies will continue all counseling, investigations and other complaint processing set forth in 29 CFR Part 1614, except in circumstances meeting the criteria described below.

2.  To the extent practicable, regulatory timeframes concerning the processing of federal sector EEO complaints will continue to be met, wherever feasible. For this purpose, practicable means where the agency and complainant have access to needed witnesses, documents and representation, and where such processing will not interfere with the mission- critical operations of the agency.

3.  The regulatory timeframes set forth in 29 C.F.R. Part 1614 will be subject to the equitable tolling provisions set forth in 29 C.F.R. §1614.604(c). Absent mutual agreement, agencies and complainants will be required to document in the record the reason(s) why tolling any of the time limits set forth in 29 CFR Part 1614 is necessary. Such justification will fully be considered by the Commission in any appeal raised in the matter.

4.  Agencies and complainants are encouraged to seek mutual agreement with respect to the extension of any timeframes. Where such agreements are reached, they should be reduced to writing and made part of the record. OFO will honor such agreements on appeal, unless they are clearly onerous to one party or otherwise violate the standards for equitable tolling, waiver or estoppel.

5.  EEOC Administrative Judges will continue to manage the hearings program. Administrative Judges will continue to hold conferences, manage discovery, refer cases to ADR and settlement, issue summary judgment decisions and, where appropriate, hold hearings and issue decisions. In light of the National Emergency, either party can seek an extension or other relief from any deadline for good cause shown.

6.  The EEOC is deeply concerned about protecting (and committed to ensuring every federal employee continues to have) all their rights during this time of National Emergency. To that end, EEOC asks agency EEO offices to continue counseling employees, accepting their discrimination complaints, and investigating these complaints to the fullest extent possible without undermining mission-critical functions. We ask agencies not to issue final actions on any EEO complaint, unless the investigation is complete and the Complainant has requested that the final action be issued.

7.  EEOC will continue to prepare appellate decisions but will not mail those decisions. A Complainant who provides an e-mail address and waives first class mailing may request the decision via e-mail to ofo.eeoc@eeoc.gov . The Commission is extremely cognizant of preserving a party's right to file a civil action in U.S. District Court. Given the current National Emergency, the Commission is suspending issuance of all appellate decisions via the U. S. mail until further notice in order to best preserve those rights.

8.  Until further notice, OFO does not have access to U.S. Mail; rather, we ask that all submissions and communications from both agencies and complainants be digital, via the Public Portal/FEDSEP. We ask those who submitted items via U.S. Mail on or after March 6, 2020 to resubmit them via the Public Portal/FEDSEP.

9.  The Commission supports and encourages the use of digital documents and electronic signatures. A digital document used by a person, agency, or other entity shall have the same force and effect as those documents not produced by electronic means. "Electronic signature" means any digital symbol, sound, or process attached to or logically associated with a digital record and executed or adopted by a person with the intent to sign the record.

10. Each agency subject to the regulations at 29 CFR Part 1614 is directed to forward a copy of this notice, using the most effective available method, to each Complainant with a pending EEO matter and to each person who hereafter contacts an agency EEO counselor or otherwise enters into the agency's EEO process.

11. For more Commission information and resources, please go to our COVID-19 information links at:  https://www.eeoc.gov/coronavirus/



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Office of Federal Operations**
**P. O. Box 77960**
**Washington, D.C.  20013**

<u>Memorandum</u>

TO:          Federal Sector EEO Directors & Officials


FROM:        Carlton M. Hadden
             Director, Office of Federal Operations

SUBJECT:     Update – April 6, 2020 Memorandum on Processing Information


We issued a memorandum dated April 6, 2020 regarding the processing of federal sector EEO complaints covered by 29 CFR Part 1614 in consideration of the National Emergency. The memorandum is attached for your ease of reference.

The EEOC reiterates its appreciation of the critical work of federal EEO professionals during this time of challenge due to the Coronavirus (COVID-9).  Your dedication is essential to ensuring access to the federal sector EEO process for all who need to utilize it.

The EEOC previously recognized that, because of the National Emergency, applicants who utilize the EEO complaint process might have faced challenges that precluded them from meeting the regulatory timeframes set forth in 29 CFR Part 1614.

Using phased approaches, several agencies and organizations have resumed fuller operations. EEOC believes that there are now fewer issues related to access to counsel and the Courts, and that further delays could negatively impact applicants' ability to protect and exercise their rights effectively.

Therefore, we are adjusting three of the instructions set forth in the April 6, 2020, memo. As discussed in further detail below, EEOC is instructing agencies to return to issuing final actions in the usual manner, unless there are compelling reasons not to do so. Effective Monday, July 27, 2020, EEOC will also expand its issuance of appellate decisions.

Instruction 6 provided as follows:

> *The EEOC is deeply concerned about protecting (and committed to ensuring every federal employee continues to have) all their rights during this time of National Emergency. To that end, EEOC asks agency EEO offices to continue counseling employees, accepting their discrimination complaints, and investigating these complaints to the fullest extent possible without undermining mission-critical functions. We ask agencies not to issue final actions on any EEO complaint, unless the investigation is complete, <u>and</u> the Complainant has requested that the final action be issued.*

Instruction 7 provided as follows:

*EEOC will continue to prepare appellate decisions but will not mail those decisions. A Complainant who provides an e-mail address and waives first class mailing may request the decision via e-mail to* ofo.eeoc@eeoc.gov *. The Commission is extremely cognizant of preserving a party's right to file a civil action in U.S. District Court. Given the current National Emergency, the Commission is suspending issuance of all appellate decisions via the U. S. mail until further notice in order to best preserve those rights.*

Instruction 8 provided as follows:

*Until further notice, OFO does not have access to U.S. Mail; rather, we ask that all submissions and communications from both agencies and complainants be digital, via the Public Portal/FEDSEP. We ask those who submitted items via U.S. Mail on or after March 6, 2020 to resubmit them via the Public Portal/FEDSEP.*

The Instructions, noted above, are modified as follows:

Instruction 6 as modified, follows:

*The EEOC remains deeply concerned about protecting (and committed to ensuring every federal employee continues to have) all their rights during this time of National Emergency. To that end, EEOC asks agency EEO offices to continue counseling employees, accepting their discrimination complaints, and investigating these complaints to the fullest extent possible without undermining mission-critical functions. Agencies should return to issuing final actions.*

Instruction 7 as modified, follows:

*EEOC is expanding issuance of appellate decisions. While the complainant may receive the appellate decision via U.S. Mail, a complainant who has an account with EEOC's Public Portal, may waive receipt via U.S. Mail, and receive the decision via the EEOC Public Portal. Please note that there may be delays in the issuance of decisions sent by first class mail depending on staff access to EEOC's headquarters. Federal agencies will receive the appellate decision via the FedSEP digital platform.*

Instruction 8 as modified, follows:

*While OFO has limited access to U.S. Mail; parties are encouraged to utilize the Commission's digital platforms, such as the EEOC Public Portal or FedSEP, to communicate with OFO.*

With the exceptions of the modifications noted above, the Instructions as set forth in the April 6, 2020 memorandum continue to remain in effect.

Each agency subject to the regulations at 29 CFR Part 1614 is directed to forward a copy of this update and notice, using the most effective available method, to each Complainant with a pending EEO matter and to each person who hereafter contacts an agency EEO counselor or otherwise enters into the agency's EEO process.